1   Bingham McCutchen LLP
    BRUCE A. FRIEDMAN (SBN 65852)
2   bruce.friedman@bingham.com
    GINA M. SIMAS (SBN 205367)
3   gina.simas@bingham.com
    The Water Garden
4   Fourth Floor, North Tower
    1620 26th Street
5   Santa Monica, CA 90404-4060
    Telephone: 310-907-1000
6   Facsimile: 310-907-2000

7   Arnold & Porter LLP                    Arnold & Porter LLP
    ANGEL A. GARGANTA (SBN 163957)         MARK P. PIFKO (SBN 228412)
8   angel.garganta@aporter.com             mark.pifko@aporter.com
    TRENTON H. NORRIS (SBN 164781)         CHRISTOPHER S. TARBELL (SBN 240253)
9   trent.norris@aporter.com               christopher.tarbell@aporter.com
    90 New Montgomery, Suite 600           777 South Figueroa Street, 44th Floor
10  San Francisco, CA 94105                Los Angeles, CA 90017
    Telephone: (415) 356-3000              Telephone: (213) 243-4000
11  Facsimile: (415) 356-3099              Facsimile: (213) 243-4199

12  Attorneys for Defendant
    The Dannon Company, Inc.
13

14              UNITED STATES DISTRICT COURT

15             CENTRAL DISTRICT OF CALIFORNIA

16                    WESTERN DIVISION

17  PATRICIA WIENER and STEVEN R.  )  No. CV08-00415 SJO (AGRx); related
18  BERUBE, On Behalf of Themselves, )  with CV08-03943 SJO (AGRx)
    All Others Similarly Situated and the )
19  General Public,                 )  **DECLARATION OF MARK P. PIFKO**
                                     )  **IN SUPPORT OF DEFENDANT'S**
20              Plaintiff,           )  **MEMORANDUM IN OPPOSITION TO**
                                     )  **PLAINTIFF'S MOTION FOR CLASS**
21          v.                       )  **CERTIFICATION**
                                     )
22  THE DANNON COMPANY, INC.,        )  Judge: Honorable S. James Otero
                                     )  Date:  September 22, 2008
23              Defendant.           )  Time:  10:00 AM
                                     )  Ctrrm: 880
24  ───────────────────────────────  )

25

26

27

28

1    I, Mark M. Pifko, declare and state as follows:

2        1.    I am an associate at the law firm of Arnold & Porter LLP, counsel of

3    record for Defendant The Dannon Company, Inc. ("Dannon").  Unless otherwise

4    stated herein, I have personal knowledge of the facts set forth below and, if called as

5    a witness, could and would competently testify thereto.

6        2.    I make this declaration in support of Dannon's Memorandum in

7    Opposition to Plaintiff's Motion for Class Certification.

8        3.    Attached hereto as Exhibit 1 is a true and correct copy of excerpts from

9    the deposition transcript of Patricia Wiener, dated August 12, 2008.

10        I declare under penalty of perjury under the laws of the United States of

11    America that the foregoing is true and correct.

12        Executed on August 25, 2008 at San Francisco, California.

13

14

15                            Mark P. Pifko

16

17

18

19

20

21

22

23

24

25

26

27

28

- 1 -

# EXHIBIT 1

Page 1

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                         WESTERN DIVISION

4    Patricia Wiener, On Behalf of     )
     Herself and All Others Similarly )
5    Situated and the General Public,  )
                                        )
6                    Plaintiff,         )
                                        )
7         vs.                           )    No. CV08-00415 SJO
                                        )                  (AGRx)
8                                       )    Pages 1 - 166
     The Dannon Company, Inc.,          )
9                                       )
                     Defendant.         )
10   _____)

11

12

13

14

15        VIDEOTAPED DEPOSITION OF PATRICIA WIENER

16               LOS ANGELES, CALIFORNIA

17              TUESDAY, AUGUST 12, 2008

18

19

20

21

22   REPORTED BY:
     LESLIE L. WHITE
23   CSR NO. 4148
     JOB NO.:  17832

24

25

EXHIBIT  1   PAGE  2

1                                        P. WIENER

2          A      I believe so.

3          Q      Are you aware that Mr. Berube -- your counsel

4    has proposed that Mr. Berube be dismissed as a plaintiff

5    from this case?

6          A      No.

7          Q      Okay.  Would it surprise you to hear that

8    Mr. Berube is being dismissed as a plaintiff in this

9    case?

10         A      No.

11         Q      Do you know why Mr. Berube was added as a

12   plaintiff in this case?

13         MR. BLOOD:  The answer is a yes-or-no question.

14         THE WITNESS:  Yes.

15   BY MR. GARGANTA:

16         Q      Why was he added?

17         A      My understanding is to represent Florida.

18         Q      To represent the state -- the State of

19   Florida?

20         A      Or to represent the -- if a Class was going to

21   happen in Florida.

22         Q      And given that, do you understand why he was

23   dismissed, or he is being dismissed?

24         A      No.

25         Q      Have you asked your lawyers why?

EXHIBIT  1    PAGE  3

1                          P. WIENER

2        A    No.

3        Q    Do you care?

4        A    Yes.

5        Q    Okay.  Well, what -- do you intend to do

6    anything at all to find out why he's being dismissed?

7        A    Yes.

8        Q    What do you intend to do?

9        A    Ask counsel.

10        Q    All right.  Let's shift the little gears and

11    get a little background on your education.

12             Beginning with your graduation from high

13    school, can you tell us your educational background.

14        A    Yes, I attended Pierce College.

15        Q    Okay.  Where is Pierce College?

16        A    Woodland Hills.

17        Q    California?

18        A    Yes.

19        Q    Okay.  And what was your major?

20        A    General Ed.

21        Q    When did you graduate?

22        A    I did not.

23        Q    Did not.  Okay.  Any additional education

24    other than the -- how many years did you attend Pierce

25    College?

EXHIBIT  I  PAGE  4

Page 33

P. WIENER

1

2      A    Because it did not alleviate any of the

3  symptoms it said it would alleviate.

4      Q    What symptoms did you have?

5      A    Oh, a little bloating, a little gas.

6      Q    Okay.  We will get into that obviously.  But

7  let me go back a minute to your decision to file the

8  lawsuit.

9           You said before you met with Ms. Goldstein you

10  hadn't considered bringing a lawsuit; right?

11      A    Right.

12      Q    Okay.  Now Ms. Goldstein lives in Florida;

13  right?

14      A    Yes.

15      Q    And you live in California; right?

16      A    Yes.

17      Q    How is it that you ended up consulting a

18  lawyer in Florida about -- when you live in California,

19  about a yogurt not having lived up to its claims?  How

20  did that come about?

21      A    Because I am friends with Jayne's daughter who

22  lives in my neighborhood.

23      Q    I see.  Okay.  What is the name of Jayne's

24  daughter?

25      A    Jennifer.

EXHIBIT  1  PAGE 5

1                          P. WIENER

2    BY MR. GARGANTA:

3        Q     Do you have a goal in mind?

4        A     Yes.

5        Q     What is it?

6        A     My goal that I have is for the people who have

7    brought -- who had purchased the product to be

8    compensated for their purchases, and to stop the

9    advertising claims that they currently have, and to

10   prevent those claims from continuing.

11       Q     Okay.  What is your understanding of what a

12   Class Action is?

13       A     My layman's understanding is that it is a --

14   it's a suit against a particular product or person, an

15   action against someone, and that it is for all the

16   people who might have purchased or used a product.

17       Q     Okay.  Did you purchase or use DanActive?

18       A     No.

19       Q     So why did you file a lawsuit about DanActive?

20       A     Because I felt that the claims that are being

21   made are similar to the claims that are being made for

22   Activia.

23       Q     How did you become aware of the claims that

24   are being made for DanActive?

25       A     I watch TV.

EXHIBIT __l__  PAGE __6__

1                          P. WIENER

2       Q    Okay.  Okay.  Was it your idea or your

3  counsel's idea to file a lawsuit about DanActive?

4       A    My counsel's.

5       Q    Okay.  So they suggested that to you?

6  MR. BLOOD:  Objection.  Attorney/client privilege.

7            Instruct you not to answer to the extent it --

8  there was a communication between your counsel and you.

9  BY MR. GARGANTA:

10      Q    Do you accept that instruction?

11      A    Yes, I do.

12      Q    But prior to speaking to your counsel --

13  strike that.

14           So you didn't purchase DanActive.  Did you

15  purchase Activia Lite ever?

16      A    No.

17      Q    Do you understand you have undertaken to

18  represent the interests of all persons claimed to

19  constitute the Class in this case?

20      A    Yes.

21      Q    Describe for us your role as the proposed

22  representative plaintiff in this case.

23      A    Well, my role is to represent all members of

24  the Class and make decisions -- the best decisions on

25  behalf of the Class.  Not decisions that would be best

EXHIBIT __1__ PAGE __7__

1                          P. WIENER

2    BY MR. GARGANTA:

3        Q    Do you have such an agreement with your

4    attorneys?

5        A    Yes.

6        Q    Okay.  With every one of your attorneys that

7    you listed?

8        A    I don't know.  I am not -- I don't know how to

9    answer that.

10       Q    What is the nature of the agreement?  Is it

11   a -- do you pay them by the hour?

12       A    No.

13       Q    Okay.  Do you pay them a percentage of any

14   recovery?  Is that the nature of the agreement?

15       A    No.

16       Q    So how do they get paid?

17       A    They are covering my costs.

18       Q    And do you have any agreement with them that

19   they will ultimately be paid some money -- I know they

20   are going to pay your costs, but how will they get paid?

21       A    I don't know.

22       Q    Are they doing this for free?

23       A    I would think not.

24       Q    Okay.  So, again, I ask you --

25       MR. BLOOD:  Calls for speculation.

EXHIBIT ____ PAGE 8

Page 48

1                                P. WIENER

2    BY MR. GARGANTA:

3        Q    How is it that your attorneys -- you're right

4    it is speculation.

5             How is it that your attorneys propose to be

6    paid in this case?

7        MR. BLOOD:  Speculation.

8        THE WITNESS:  I would think that if there is a

9    settlement of some sort, that their costs would be

10   covered at that point.

11   BY MR. GARGANTA:

12       Q    Is there a written agreement between you and

13   your attorneys that says that?

14       A    No.

15       Q    There is no written agreement?

16       A    That says what?

17       Q    That says how your attorneys would be paid.

18       A    No, I don't know how they are paid.

19       Q    And you have never been shown a written -- or

20   asked to sign a written Retainer Agreement with your

21   attorneys?

22       A    I believe I signed a retainer.  Again, I am

23   not a legal person, so --

24       Q    Did you read it?

25       A    Did I read what?

EXHIBIT___l___PAGE___9___

Page 49

1                               P. WIENER

2        Q    The Retainer Agreement that you signed before

3   you signed it.

4        A    I'm sure I did.

5        Q    Okay.  And do you remember what it says?

6        A    You know what, I read a lot of papers, so I

7   can't remember everything.

8        Q    Okay, so you don't -- as you sit here today,

9   you don't remember what it says about how your attorneys

10  would be paid?  Is that your testimony?

11       A    Yes.

12       Q    Okay.  Do you care about how your attorneys

13  would be paid?

14       A    Sure, yes.

15       Q    Okay.  So don't -- but it's something that you

16  don't remember?

17       A    No.

18       Q    Okay.  Do you have any licenses, other than a

19  driver's license?

20       A    I don't think so.

21       Q    Okay.  Do you understand that as a proposed

22  representative plaintiff, personal information may need

23  to be disclosed about you in court?

24       A    Yes.

25       Q    Are you willing to have such information

EXHIBIT___1___ PAGE___10___

Page 77

P. WIENER

1

2       Q     Okay.  What is that understanding?

3       A     Well, that would be the time it would take

4    from when you consumed something for it to then exit

5    your body.

6       Q     Okay.  But you don't recall hearing anything

7    about slow intestinal transit in the ad?

8       A     I don't recall.

9       Q     Okay.  Did slow intestinal transit have

10   anything to do with the reason that you purchased

11   Activia?

12      A     No.

13      Q     So just to make sure I understand you

14   correctly, you purchased Activia because you had

15   bloating and gas, and you thought it might help you with

16   it; is that correct?

17      A     Yes.

18      Q     What in the ad -- what was said in the ad that

19   suggested to you that it would help you with bloating

20   and gas?

21      A     Well, it said to me that only Activia had

22   bifudis regularis, and that this special ingredient or

23   probiotic, I believe the word was, was clinically

24   proven, when eaten daily for two weeks, would naturally

25   regulate my digestive system.

EXHIBIT    l    PAGE  ll

1                        P. WIENER

2        A    No.

3        Q    Okay.  Had you tasted Activia at a friends, or

4    anything like that before?

5        A    No.

6        Q    Had any of your friends or acquaintances said,

7    "Try Activia"?

8        A    No.

9        Q    Okay.  Did you like the green packaging at

10   all?

11       MR. BLOOD:  Speculation.

12       MR. GARGANTA:  I'm asking if she liked it.

13       THE WITNESS:  I felt no particular attachment to

14   the green packaging.

15   BY MR. GARGANTA:

16       Q    Okay.  What about the Dannon name, did that

17   mean anything to you, The Dannon Company?

18       A    Yes.

19       Q    What did The Dannon Company mean to you?

20       A    Confidence that I was buying a good product.

21       Q    Okay.  Why is that?

22       A    Because Dannon is a company that I believe

23   sells quality product.

24       Q    Had you bought other Dannon products in the

25   past?

EXHIBIT   1   PAGE  12

1                           P. WIENER

2        A     Yes.

3        Q     What products?

4        A     Yogurt.

5        Q     Any particular type of yogurt?

6        A     Yes.

7        Q     What kind?

8        A     I believe it's called Lite and Fit.

9        Q     Okay.  And were you satisfied with that

10   product?

11       A     Yes.

12       Q     Any other Dannon products that you bought and

13   were satisfied with?

14       A     Yes.

15       Q     What else?

16       A     I believe it's called -- it has been a

17   while -- Danimals.

18       Q     "Danimals"?

19       A     Correct.

20       Q     For your kids?

21       A     Yes.

22       Q     Okay.  And were you satisfied with Danimals?

23       A     Yes.

24       Q     Okay.  Had you -- when you bought Activia, did

25   you avail yourself of any coupons or sale price?

EXHIBIT___1___ PAGE__13

1                           P. WIENER

2        A    I didn't find it pleasing.

3        Q    Because too sweet?  Too sour?  What?

4        A    Just didn't care for the taste.

5        Q    What flavor was it?

6        A    I don't remember.

7        Q    Did you consider trying a different flavor?

8        A    No.  I had already purchased, so no.

9        Q    Was it all the same flavor, or did you try

10   different flavors --

11       A    I don't remember.

12       Q    -- when you purchased?

13       A    I don't remember.

14       Q    I assume you don't have the receipts or

15   anything like that, do you?

16       A    No.

17       Q    Okay.  All right.  Now have you ever heard of

18   something called the Activia Challenge?

19       A    Yes.

20       Q    Okay.  Tell us your understanding -- and had

21   you heard of the Activia Challenge before you purchased

22   Activia?

23       A    No.

24       Q    No?  Okay.  But you bought two weeks' worth?

25       A    Yes.

EXHIBIT___|___ PAGE__14__

Page 94

P. WIENER

1

2  Activia for two weeks did you meet with Ms. Goldstein

3  about it?

4      A    Approximately 13, 14 months.

5      Q    Okay.  So how is it that 13 and 14 months

6  after eating some yogurt for two weeks it came up as

7  topic of conversation with a lawyer?

8      MR. BLOOD:  I am not sure if that --

9      MR. GARGANTA:  I'm asking what led her to raise it.

10     Q    If you raised it.  Were you the one that

11  raised Activia with Ms. Goldstein, or did she raise it

12  with you?

13     A    I did not raise it.

14     Q    Okay.  So did she raise it with you?

15     MR. BLOOD:  Vague as to "it."

16  BY MR. GARGANTA:

17     Q    Did she ask you, "Have you ever had Activia?"

18     A    Not -- at some point in time, yes.

19     Q    Okay.  I'm trying to understand how it is that

20  14 months after you tried Activia for two weeks, and

21  then you thought it hadn't worked, the subject came up

22  with a Class Action lawyer.

23     MR. BLOOD:  There is no question.  You don't have

24  to answer it.  That was just a statement.

25     MR. GARGANTA:  No, that's the question.  Please

EXHIBIT __1__ PAGE __15__

1                        P. WIENER

2        MR. GARGANTA:  Before she was retained.

3        Q    Before she was retained.

4        A    I'm sorry, can you repeat.

5        Q    Before you retained Ms. Goldstein as your

6    attorney, did she tell you that she was considering the

7    possibility of a Class Action lawsuit against The Dannon

8    Company over Activia?

9        A    Yes.

10       Q    And what did she tell you about that?

11       A    Exactly what you just said to me, that she was

12   investigating -- she was investigating the claims that

13   Activia makes.

14       Q    Okay.  Did she ask you if you were interested

15   in serving as a plaintiff in that contemplated Class

16   Action lawsuit?

17       MR. BLOOD:  Again, all these questions are before

18   there was a --

19       MR. GARGANTA:  Before she was retained.

20       MR. BLOOD:  Okay.

21       THE WITNESS:  I told her that I would be interested

22   in -- I told her that I would be interested.

23   BY MR. GARGANTA:

24       Q    So that came from you?  It wasn't a question

25   from her to you, it was a suggestion from you to her; is

EXHIBIT  1   PAGE  16

Page 109

                           P. WIENER

2  Federation and Asperger's.

3         Q    Asperger's Foundation or some --

4         A    Yes.

5         Q    -- charity that does research into Asperger's?

6         A    Yes.

7         Q    Now you testified that you did not have the

8  Activia Challenge as part of the advertisement that you

9  saw, or you don't recall hearing about the Activia

10 Challenge prior to your purchase of Activia.

11        But my question to you is did you know that

12 the Activia Challenge was available afterwards?

13     MR. BLOOD:  Vague --

14 BY MR. GARGANTA:

15     Q    Did you see any ads about the Activia

16 Challenge after your purchase?

17     A    Yes, I have.

18     Q    Did it occur to you, after you used Activia

19 and you didn't like it, to try to avail yourself of the

20 offer and say, "Look, you know, it didn't work for me.

21 I want my money back"?

22     MR. BLOOD:  Foundation.

23     THE WITNESS:  No.

24 BY MR. GARGANTA:

25     Q    Why not?

EXHIBIT ___ PAGE ___

1          P. WIENER

2     A     Life is busy.  I run a business, I run a

3   company, I have two children, and it wasn't the first

4   and foremost in my mind.

5     Q     Okay.  So do you understand that if the Class

6   prevails in this lawsuit, and you get whatever what

7   everybody else gets, at most what you're going to get is

8   your money back?

9          Do you understand that?

10    MR. BLOOD:  That's not accurate.

11    MR. GARGANTA:  Well, okay.

12    Q     What do you think -- let's go right to the

13   issue of restitution.

14         What do you believe you stand to recover, you

15   personally, stand to recover from Dannon, if you prevail

16   in this lawsuit?

17    A     Monetarily?

18    Q     Monetarily.

19    A     I would imagine my purchase price back.

20    Q     About $12; right?

21    A     Give or take.

22    Q     Okay.  Why didn't you ask Dannon for those $12

23   as part of the Activia Challenge?

24    MR. BLOOD:  Lacks foundation.

25    THE WITNESS:  When I had purchased the product they

EXHIBIT __1__ PAGE __18__

1                          P. WIENER

2    weren't offering it back to me.

3    BY MR. GARGANTA:

4        Q    Okay --

5        MR. BLOOD:   I'm sorry, and incomplete hypothetical.

6    BY MR. GARGANTA:

7        Q    Well, later on you saw some ads about it;

8    right?

9        A    Right.

10       Q    Okay.   And did it occur to you to seek your

11   money back then, after seeing those ads and believing,

12   as you did, as you have testified, that Activia had not

13   worked for you?

14       A    I'm sorry, can you re -- say it again, please.

15       MR. GARGANTA:   Can you --

16           (The record was read.)

17       THE WITNESS:   Once again, no.

18   BY MR. GARGANTA:

19       Q    Okay.   Did you contact Dannon at any time,

20   prior to filing the lawsuit, to complain that Activia

21   had not worked for you?

22       A    No.

23       Q    Why didn't you do that?

24       A    It had not occurred to me to do that.

25       Q    You mentioned probiotics earlier today, and I

EXHIBIT __1__  PAGE __19__

1                           P. WIENER

2     think the court reporter asked you to spell it off the

3     record.

4               Do you know what probiotics is or what a

5     probiotic is?

6          A    I might have a little understanding.

7          Q    Okay.  Did you have any understanding of what

8     a probiotic is before you purchased Activia?

9          A    Again --

10         MR. BLOOD:  I'm sorry, answer his question.

11         THE WITNESS:  Okay.

12    BY MR. GARGANTA:

13         Q    Did you have an understanding of what a

14    probiotic is, before you purchased the Activia?

15         A    I thought I might have an understanding.

16         Q    Okay.  And what was that understanding?  Can

17    you give us that understanding.

18         A    That it was a -- some type of a bacteria.

19         Q    Is that -- does that constitute your entire

20    understanding, or did you have a further understanding?

21         MR. BLOOD:  At that time.

22         THE WITNESS:  At that time --

23    BY MR. GARGANTA:

24         Q    At that time.

25         A    At that time it was my understanding.

EXHIBIT __ PAGE 20

Page 113

1                      P. WIENER

2      Q    What was that understanding based on?

3      A    It was based on just what I had heard about

4  a -- had heard about the term.

5      Q    Where had you heard about the term?

6      A    I cannot give you specifics up until that

7  point.

8      Q    Do you recall reading any literature that used

9  the term "probiotic"?

10     A    I don't recall.

11     Q    Do you recall maybe, you know, reading any

12  magazine article?

13     A    I might have.  I can't recall specifically.

14     Q    What -- do you recall having seen anything on

15  the Internet about probiotics?

16     A    Again, I can't recall anything specifically.

17     Q    I believe -- I didn't want to misstate your

18  testimony.  I believe you said that your understanding

19  at the time was that a probiotic is some kind of

20  bacteria?

21     A    I believe that's what I said.

22     Q    And is that it, just a bacteria, or anything

23  else about a probiotic bacteria that was part of your

24  understanding?

25     A    Back at the original --

EXHIBIT __1__ PAGE __24__

Page 114

1                          P. WIENER

2        Q    At the time.

3        A    You are correct in your statement; that that

4   was my understanding.

5        Q    Okay.  Did you have an understanding as to

6   whether it was a good bacteria or a bad bacteria?

7        A    Well, just by deducing the name of a

8   "probiotic," I would think that it was a good bacteria.

9        MR. BLOOD:  Listen to his question, though, and

10  answer his question, if you can.

11            He's asking at the time what was your

12  understanding.  So don't deconstruct it, as you sit here

13  today.  If you had that understanding back then, answer

14  it.  If you don't remember what your understanding is,

15  tell him that.  If you -- whatever.  You know what I

16  mean?

17       MR. GARGANTA:  I think she's trying to give it to

18  us, Counsel.  So let's let her do it.

19       Q    At the time did you have -- you said something

20  about by deducing the name.

21            At the time did you have an understanding of

22  what the term "probiotic" means?

23       A    If you're asking me a -- if it was -- did I

24  know the dictionary term or the scientific explanation

25  pertaining to the word "probiotic"?

EXHIBIT___1___ PAGE 22

Page 115

                              P. WIENER

1

2      Q    No, I'm asking if you had any understanding of

3    the meaning of the term.

4      A    My meaning of the term at the time was

5    bacteria.

6      Q    Since then, since you bought -- the time when

7    you bought Activia, have you developed a different

8    understanding of what "probiotic" means?

9      A    I believe that my understanding is still

10   generally the same.

11     Q    But you just referred to by deducing from the

12   meaning of the term, it must mean good, or words to that

13   effect.  Why did you tell me that?

14     A    I think when you initially hear the word

15   "probiotic," you think "pro."

16     Q    Okay.  So it's because of the "pro"?

17     A    Initially I think maybe when you hear that

18   word.  But from what my understanding was is that it had

19   to do with the bacteria -- with bacteria.

20     Q    With bacteria that did something for you or

21   not?

22     A    That did something for you.

23     Q    And you had that understanding before you

24   bought Activia; is that correct?

25     A    I believe so.

EXHIBIT  1  PAGE 23

Page 116

1                        P. WIENER

2        Q     Have you tried any other products with

3   probiotics other than Activia?

4        A     No.

5        Q     None at all?

6        A     Correct.

7        Q     I think you -- well, I know you testified

8   earlier that you purchased other Dannon yogurt products,

9   and you told us some of them.

10            Any -- other than the yogurt products that you

11  mentioned earlier, have you purchased other yogurt

12  products that you didn't mention to us, not just Dannon?

13       A     Other manufacturers?

14       Q     Other manufacturers of yogurt products.

15       MR. BLOOD:  At any time?

16  BY MR. GARGANTA:

17       Q     Yes.

18       A     Yes.

19       Q     Okay.  And which ones do you recall?

20       A     Yoplait.

21       Q     Have you tried Yoplait Yo-Plus?

22       A     No.

23       Q     Have you seen the ads for Yoplait Yo-Plus?

24       A     I believe so.

25       Q     What do you recall about those ads?

EXHIBIT___1___ PAGE 24

Page 117

1                              P. WIENER

2        A     Not too much.

3        Q     Do you recall when you saw those ads?

4        A     No.

5        Q     Okay.  Did your experience with other yogurt

6   products that you used before purchasing Activia have

7   any bearing at all on your decision to purchase Activia?

8        MR. BLOOD:  Vague.

9        THE WITNESS:  Yes.

10  BY MR. GARGANTA:

11       Q     Tell me what experience that -- what bearing

12  that had.

13       A     Well, I think that the fact that I had

14  purchased Dannon in the past.

15       Q     Okay.

16       A     Again, it was a quality product and a name

17  that I could trust.  And brand recognition.

18       Q     What about yogurt products generally?  Having

19  used yogurt products, did you have a favorable

20  impression of yogurt?

21       A     I like yogurt.

22       Q     So you like yogurt?

23       A     Yes.

24       Q     Do you think yogurt is healthy?

25       A     Yes and no.

EXHIBIT ___ PAGE 25

Page 121

1                              P. WIENER

2              Do you think everyone else who purchased

3    Activia -- okay, everyone else who purchased Activia had

4    the same experience with Activia that you did?

5         MR. BLOOD:  Foundation.  Speculation.

6         THE WITNESS:  I don't know.

7    BY MR. GARGANTA:

8         Q    Okay.  So why do you think that -- strike

9    that.

10             So if you don't know what other people's

11   experience is, why do you think it's appropriate for you

12   to have filed a lawsuit claiming what you claim?

13        MR. BLOOD:  Overbroad.

14        THE WITNESS:  Because I don't think it was

15   appropriate for Dannon to tell me that if I took this

16   product it was going to naturally regulate my digestive

17   system in two weeks.

18   BY MR. GARGANTA:

19        Q    It didn't work for you; right?

20        A    Correct.

21        Q    But do you have any -- do you have any

22   information as to what percentage of people it worked

23   for in and what percentage it didn't work for?

24        A    No, I relied on my counsel for that.

25        Q    Have you made any effort to find out how other

EXHIBIT___  PAGE 26

Page 126

1                              P. WIENER

2          MR. BLOOD:  Calls for a legal conclusion.  To the

3     extent you have formed that information based on

4     conversations that you have had with your attorneys, I

5     would instruct you not to answer on the basis of

6     attorney/client privilege, and also the work product

7     doctrine.

8     BY MR. GARGANTA:

9          Q    Do you accept that instruction?

10         A    I accept that instruction.

11         Q    Okay.

12              Do you also -- is it also your intention to

13    represent people who believe that Activia did work for

14    them?

15         A    That's not what this lawsuit is about.

16         Q    Okay.  So you're only representing those

17    people that you that think Activia didn't work for them?

18         MR. BLOOD:  Calls for a legal conclusion.

19    Foundation.

20         THE WITNESS:  I'm representing the whole Class.

21    BY MR. GARGANTA:

22         Q    Does the Class include people who are

23    satisfied with Activia, and who think that it's a good

24    product and that it worked for them?

25         A    I don't believe so.

EXHIBIT __1__ PAGE __27__

Page 127

1                          P. WIENER

2        Q    What about DanActive, you didn't even buy

3    DanActive, but is it your intention to represent people

4    who had satisfied with DanActive?

5        MR. BLOOD:  Same objections.

6        THE WITNESS:  I think I would gave you the same

7    answer that I gave you for the Activia product.

8    BY MR. GARGANTA:

9        Q    And what is that, you don't believe so?

10       A    I don't recall.

11       Q    Do you have any idea who you're representing

12   on behalf of the DanActive Class?

13       A    Well, I'm representing those persons in the

14   State of California who have purchased Activia up until

15   August of '08.

16       Q    Whether -- okay.  And what about DanActive,

17   are you representing anybody who purchased DanActive?

18       A    Yes.

19       Q    Are you representing people who were satisfied

20   with DanActive?

21       A    It was all the persons who have purchased the

22   product.

23       Q    Why are you trying to represent people who

24   purchased it but are happy with it?

25       MR. BLOOD:  Calls for a legal conclusion.

EXHIBIT __1__  PAGE _28_

1                          P. WIENER

2          MR. GARGANTA:   You guys have plenty of those.

3          Q    Again, I don't want you to read it.  I'm going

4     to call your attention to parts of it, but I'd like you

5     to look at Exhibit 2 and tell us, please, whether you

6     recognize it.

7          A    Yes.

8          Q    What is it?

9          A    I don't know your exact legal term, but I

10    think it's my Class Action Complaint.

11         Q    Okay.  When was the first time you saw this

12    document?

13         A    I don't remember the exact date.

14         Q    You see these markings on it with the date and

15    the stamp "CV-O8-00415," and all of that?

16         A    Uh-huh, yes.

17         Q    Have you ever seen a version of this document

18    without those markings on it?

19         A    I don't recall.

20         Q    Did you see this document before it was filed?

21         A    I don't recall.

22         Q    Have you ever read this document in its

23    entirety?

24         A    Yes.

25         Q    When?

EXHIBIT___  PAGE  29

Page 130

1                         P. WIENER

2        A    I can't give you an exact date that I read

3   the -- I can't give you the exact date.  When it was

4   given to me, I read it.

5        Q    Okay.  Did you participate in any way in the

6   preparation of the Complaint?

7        A    I spoke with counsel.

8        Q    What did you -- I am not going to ask you what

9   you spoke about with counsel.

10            How did you -- other than speaking with

11  counsel, how did you participate in the preparation of

12  the Complaint?

13       A    Just in speaking with counsel.

14       Q    Okay.  Did you review any of the scientific

15  studies that are referred to in the Complaint?

16       A    I relied on my counsel to do that.

17       Q    Okay.  Have you ever reviewed any of the

18  scientific studies that Dannon relays on to substantiate

19  its claims?

20       A    I have --

21       MR. BLOOD:  Lacks foundation.  Calls for

22  speculation.

23  BY MR. GARGANTA:

24       Q    Have you ever reviewed any of the studies that

25  Dannon relies on?

EXHIBIT  1   PAGE  30

Page 132

1                              P. WIENER

2          MR. BLOOD:  Document speaks for itself.

3          MR. GARGANTA:  This goes to the witness' knowledge.

4          Q    Do you know what differences there are?

5          A    I know that in Exhibit 3 it has been changed

6    from "Plaintiff Patricia Wiener" to "Patricia Wiener and

7    Steven Berube."

8          Q    Okay.  So Mr. Berube was added as a plaintiff?

9          A    Yes.

10         Q    Do you know why that occurred?

11         A    I don't know all the exact details.

12         Q    Okay.  What details do you know?  Can you

13   share them with us?

14         MR. BLOOD:  Not if they were based on

15   communications you had with your attorneys.

16         THE WITNESS:  They were.

17         MR. GARGANTA:  Okay.  So is that an instruction not

18   to answer?

19         MR. BLOOD:  Yes.

20   BY MR. GARGANTA:

21         Q    And do you accept that instruction?

22         A    Yes, I do.

23         Q    Go back to Exhibit 2, if you will,

24   paragraph 13, second sentence beginning, "During the

25   Class period."

EXHIBIT ___ PAGE 3

Page 144

1                          P. WIENER

2         Q     And what is that?

3         MR. BLOOD:  Calls for a legal conclusion.  Document

4    speaks for itself.

5         THE WITNESS:  I'd like them to cease making claims

6    that aren't true.

7    BY MR. GARGANTA:

8         Q     That you believe aren't true because the

9    product didn't work for you; right?

10        A     Correct.

11        MR. BLOOD:  Asked and answered.

12   BY MR. GARGANTA:

13        Q     Are you aware there was a mediation in this

14   case?

15        A     Yes.

16        Q     When was it?

17        A     Approximately a month ago.

18        Q     Why didn't you attend the mediation?

19        A     I relied on my counsel.

20        Q     Don't you think it's important for you, as the

21   representative of the Class who wants to represent all

22   of these other people similarly situated, to attend the

23   mediation in the case?

24        MR. BLOOD:  Calls for speculation.  Lacks

25   foundation.

EXHIBIT  1   PAGE 32

Page 145

1                              P. WIENER

2          THE WITNESS:  No, I relied on my counsel.

3     BY MR. GARGANTA:

4          Q     Okay.  So you weren't there?

5          A     Correct.

6          Q     Did you read the mediation briefs?

7          MR. BLOOD:  Foundation.

8          THE WITNESS:  I don't recall.  I'd have to see what

9     they look like.

10    BY MR. GARGANTA:

11         Q     Do you know what a mediation brief is?

12         A     I don't know.  I have to see it.

13         Q     Okay.  Didn't you think it was important for

14    you to personally hear Dannon's position?

15         A     I relied on my counsel, of my counsel to do

16    that for me.

17         MR. BLOOD:  Speculation.

18    BY MR. GARGANTA:

19         Q     Do you intend to rely on your counsel at trial

20    too?  I mean, are you planning to show up at trial?

21         MR. BLOOD:  Compound.

22         THE WITNESS:  If I'm needed to be at trial, I will

23    be at trial.

24    BY MR. GARGANTA:

25         Q     Every day?

EXHIBIT __1__  PAGE 33

Page 151

1          P. WIENER

2     verification.  Okay.  It says -- see there where it

3     says, "I declare under penalty of perjury under the laws

4     of the State of California that the responses therein,"

5     meaning in this special interrogatory responses "are

6     true and correct, to the best of my knowledge."

7              Do you see that?

8     A     Yes, I do.

9     Q     What did you do to determine whether the

10    responses in this document are true and correct?

11    A     To the best of my knowledge?

12    Q     Yeah, what did you do?

13    A     I read it.

14    Q     What knowledge did you have?

15    A     The best knowledge that I had.

16    Q     How much knowledge was that?

17    A     Do you want me to measure it?

18    Q     Well, I just want you to tell me what it is

19    you knew, since you don't even remember how long before

20    you signed the Verification you had seen the document or

21    whether you had seen any drafts of the document.

22    A     Well, my knowledge was based upon reading the

23    document and relying on my counsel.

24    Q     So you relied on your counsel; right?  Is that

25    your answer?

EXHIBIT__l__ PAGE 34

Page 154

1                           P. WIENER

2       Q    Do you recognize the exhibit?  Have you seen

3  it before?

4       A    I have seen so much that they all start to

5  look alike after a while.  I believe I have seen it.

6       Q    When do you believe you have seen it before?

7       A    Um, recently.

8       Q    How recently?

9       A    I would assume in the past month.

10      Q    Did you search for any documents in connection

11 with this Response to Document Requests?

12      A    Did I personally?

13      Q    Yes.  Did you personally search for any

14 documents?

15      A    No.

16      Q    Did your counsel -- without disclosing

17 attorney/client privilege, but I'm simply asking a yes

18 or no -- did your counsel ask you to search for any

19 documents responsive to the defendant's document

20 request?

21      A    Not that I can recall.

22      Q    You testified that you had some notes that you

23 had taken about the issues in the lawsuit.

24      A    Along the way.

25      Q    Along the way?  And you said some of the notes

EXHIBIT___l___ PAGE__35

Page 159

1                           P. WIENER

2        A    No.

3        Q    Does that cause you any concern about the

4    Coughlin Stoia's ability to represent you and the Class

5    in this litigation?

6        A    I don't know.  You're just springing that on

7    me, so . . .

8        Q    Do you intend to look into that?

9        A    Yes.

10       Q    Don't you think it's your obligation to do so?

11       A    I would think so.

12       Q    As the representative plaintiff?

13       A    Yes.

14       Q    Okay.  Why did you pick Mager & Goldstein to

15   represent you?

16       A    Because I felt that Jayne is a very competent

17   person.

18       Q    Do you know anyone else in her firm?

19       A    No, I only know Jayne.

20       Q    Why did you pick Gilman and Pastor to

21   represent you?

22       A    My counsel picked -- I didn't.  My counsel

23   did.

24       Q    Did you conduct any independent investigation

25   of the qualifications of Gilman and Pastor to represent

EXHIBIT    1    PAGE 36

0164

1           P. WIENER

2              * * *

3

4

5  I, DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING

6  IS AN ACCURATE TRANSCRIPTION OF MY TESTIMONY UNDER THE

7  LAWS OF THE STATE OF CALIFORNIA, EXECUTED ON THE 20th

8  DAY OF _Back_ . August, 2008

9

10

11

12           PATRICIA WIENER

13

14

15

16

17

18

19

20

21

22

EXHIBIT __1__ PAGE 37

Page 165

1                          P. WIENER

2                  REPORTER'S CERTIFICATE

3                            OF

4              CERTIFIED SHORTHAND REPORTER

5

6                    *  *  *  *  *  *  *

7

8

9    I, THE UNDERSIGNED CERTIFIED SHORTHAND REPORTER, IN AND

10   FOR THE STATE OF CALIFORNIA, DO HEREBY CERTIFY:  THAT

11   THE FOREGOING PROCEEDINGS WERE TAKEN BEFORE ME AT THE

12   TIME AND PLACE THEREIN SET FORTH, AT WHICH TIME THE

13   WITNESS WAS PUT UNDER OATH BY ME; THAT THE TESTIMONY OF

14   THE WITNESS AND ALL OBJECTIONS AT THE TIME OF THE

15   PROCEEDINGS WERE RECORDED STENOGRAPHICALLY BY ME AND

16   WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION; THAT THE

17   FOREGOING IS A TRUE RECORD OF THE TESTIMONY AND OF ALL

18   OBJECTIONS MADE AT THE TIME OF THE PROCEEDINGS.

19

20

21   IN WITNESS WHEREOF, I HAVE SUBSCRIBED MY NAME ON:

22

     DATE: 8/13/08

23

24   _____

25        LESLIE L. WHITE, CSR NO. 4148

EXHIBIT  1  PAGE  38

## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certified that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on August 25, 2008.

/s/  Angel A. Garganta
Arnold & Porter LLP
ANGEL A. GARGANTA (SBN 163957)
angel_garganta@aporter.com
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017
Telephone: (213) 243-4000
Facsimile:  (213) 243-4199

CERTIFICATE OF SERVICE

# Mailing Information for a Case 2:08-cv-00415-SJO-AGR

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Lee Albert**
  lalbert@magergoldstein.com

- **Timothy G Blood**
  timb@csgrr.com

- **Jonathan W Cuneo**
  jonc@cuneolaw.com

- **Bruce A Friedman**
  bruce.friedman@bingham.com,donna.mcgee@bingham.com

- **Angel A Garganta**
  angel.garganta@aporter.com,cathryn.tully@aporter.com,maryanne.donaldson@aporter.com,kendra.thompson@aporter.com

- **Pamela Gilbert**
  pamelag@cuneolaw.com

- **Jayne A Goldstein**
  jgoldstein@magergoldstein.com

- **Leslie Hurst**
  leslieh@csgrr.com

- **Trenton H Norris**
  trent.norris@aporter.com,delicia.soza@aporter.com

- **Thomas Joseph O'Reardon , II**
  toreardon@csgrr.com

- **David Pastor**
  dpastor@gilmanpastor.com

- **Mark P Pifko**
  mark.pifko@aporter.com,leyla.cambel@aporter.com

- **Gina M Simas**
  gina.simas@bingham.com

- **Jonathan M Stein**
  jstein@csgrr.com,e_file_fl@csgrr.com

- **John J Stoia , Jr**
  johns@csgrr.com,e_file_sd@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)